RUBY MENHUSEN, APPELLEE, V.
JAMES DAKE, APPELLANT.

334 N.W.2d 435

Filed May 27, 1983. No. 82-105.

Kelly & Kelly, for appellant.

Cunningham, Blackburn, VonSeggern, Livingston, Francis & Riley, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

CAPORALE, J.

This appeal by James Dake arises from an action instituted by Ruby Menhusen, appellee, against Dake when he walked away from and ended a living arrangement he had shared with Menhusen. Following a jury trial a judgment in the sum of $17,500 was entered against Dake. We reverse and direct dismissal.

Menhusen's petition alleged that under Dake's promise to marry her, she and he cohabited together as husband and wife until he moved out of the home of the parties and withdrew his promise of marriage, as the result of which she suffered damage. In his answer Dake denied the operative allegations of Menhusen's petition.

The evidence establishes that Menhusen is the divorced mother of six children, two of whom are still minors. Dake has been divorced twice and is the father of a minor child. The parties met in October of 1979 at a department store in Topeka, Kansas, where Dake was employed as a management trainee and Menhusen had taken a second job. The par-

ties began dating and, in February or March of 1980, decided to marry before Dake was to move to Grand Island, Nebraska, for new employment. However, the parties did not marry at that time because Dake pled a lack of time due to preparation for his new job. When Dake moved to Grand Island in April of 1980 he left his 7-year-old daughter with Menhusen. On May 22, 1980, Dake wrote to Menhusen stating he wished to marry her and enclosed a clipping from a Grand Island newspaper carrying an announcement of his new position as a theater manager. That article recited he was married to Menhusen and had three children. Menhusen, those of her children living with her, and Dake's daughter moved to Grand Island at the end of May 1980 and the parties began to live together. Menhusen obtained a driver's license and a practical nursing license under the surname of Dake. She secured employment at a hospital in Grand Island at a lesser salary than she had been earning at a hospital in Topeka. Dake arranged for Menhusen to be covered under health insurance obtained through his employment. The parties held themselves out to their new friends, acquaintances, and others in Grand Island as husband and wife. On October 30, 1980, Menhusen entered the hospital with a cardiac problem. After her return from a short period of hospitalization, Dake unchivalrously left Menhusen and moved out of the home the parties had been occupying. He surrendered possession of his child, who had become a discipline problem, to the child's mother. Such items of personal property as had been acquired by the parties during the period they cohabited were left with Menhusen, and Dake makes no claim to them. Menhusen testified that after Dake left she was no longer covered by any insurance; was in ill health; could not afford to move back to Kansas to be with her family; and that a number of bills, some of which were incurred as the result of her health problems and some of which were incurred to clothe

the children and Dake, remained to be paid. Moreover, she testified that she suffered humiliation and embarrassment by having to explain to her friends, acquaintances, and employer that she was in fact not married. She has been unsuccessful in efforts to get her nursing and driver's licenses changed to reflect her true name.

Among Dake's assignments of error is the contention that the trial court erred in instructing the jury that the issues were whether Dake promised to marry Menhusen, whether he breached that promise, and whether Menhusen was damaged as the proximate result of that breach. Much as our sympathies may rest with Menhusen's plight, we must agree with that contention of error.

This case has been misperceived as one presenting a cause of action for breach of a promise to marry; it is in fact an effort to recover damages for the termination of a living arrangement. That being so, it is unnecessary for us to determine, as suggested by Dake, whether the current rule for the measure of damages in a suit for breach of a promise to marry is outdated and in need of revision. The present rule in that regard recognizes that there are no precise rules for measuring damages, and the amount should be left to the sound discretion of the trier of facts, who may take into account the injury to the plaintiff's health; the effect of the breach on plaintiff's feelings; plaintiff's mental suffering, wounded pride, humiliation, pain, and mortification; and the loss of the pecuniary benefits of the promise to marry. *Kuhlman v. Cargile*, 200 Neb. 150, 262 N.W.2d 454 (1978); *Harsche v. Czyz*, 157 Neb. 699, 61 N.W.2d 265 (1953). For the same reason we need not reconsider in this case whether this ancient common-law cause of action continues to serve a purpose in today's society. See Clark, Law of Domestic Relations § 1.5 (1968).

Although we have approved recovery for seduction achieved through and by reason of reliance upon a

promise to marry, *Ryan v. Oswald*, 134 Neb. 265, 278 N.W. 508 (1938), and *Musselman v. Barker*, 26 Neb. 737, 42 N.W. 759 (1889), we have also observed that a promise of marriage in consideration of sexual intercourse is void. *Rich v. Fulton*, 104 Neb. 262, 177 N.W. 175 (1920).

We now hold that any cause of action which may otherwise exist by reason of the breach of a promise to marry is extinguished once the parties begin to cohabit prior to fulfillment of the promise. Damages which flow from the breach of a promise to marry result directly from the unilateral refusal of the promisor to carry out the promise. Such is not the case once the parties have cohabited prior to marriage. In the latter instance each party has participated in creating a living arrangement and each party has partaken of the responsibility for the conduct and duration of that arrangement. It can then no longer be said that such damages as may flow from the termination of the living arrangement are directly caused by the promisor's breach of the promise to marry.

In view of the foregoing determination, it is unnecessary to discuss Dake's other assignments of error. The judgment of the trial court is reversed with directions to dismiss the suit.

REVERSED WITH DIRECTIONS.